**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
**-----------------------------------------------------------------------X**
**In re:**

        **Airat Temitayo Adejobi,**           **Chapter 13**
         **a/k/a Airat Temitayo Bakare**      **Case No. 1-08-42518-jf**

                             **Debtor.**
**-----------------------------------------------------------------------X**

## DECISION AND ORDER DENYING DEBTOR'S MOTION
## TO REDUCE SECURED CREDITOR'S CLAIM

**APPEARANCES:**

| | |
|---|---|
| **Stuart P. Gelberg, Esq.** | **Doris Barkhordar, Esq.** |
| **600 Old Country Road** | **Deutsch & Schneider, LLP** |
| **Suite 410** | **79-37 Myrtle Avenue** |
| **Garden City, New York 11530** | **Glendale, New York 11385** |
| **Debtor's Counsel** | **Counsel for Emigrant Funding Corporation** |

**Marianne DeRosa**
**100 Jericho Quadrangle**
**Suite 208**
**Jericho, New York 11753**
**Chapter 13 Trustee**

 

                                          **JEROME FELLER**
                             **United States Bankruptcy Judge**

Before the Court in the above-captioned Chapter 13 case is a motion ("Motion") of Airat Temitayo Adejobi a/k/a Airat Temitayo Bakare ("Debtor") to reduce a proof of claim filed by Emigrant Funding Corporation ("Emigrant") designated as Claim Number 2 on the claims register ("Claim"). The Debtor objects to that part of the Claim for pre-petition arrears calculated by Emigrant through utilization of a contractual default rate of interest ("Default Interest Rate"). The Debtor argues that the pre-default rate of interest ("Non-Default Interest Rate") is the proper interest rate to be used.

Upon review of all the submissions and after hearing oral argument, we conclude that 11 U.S.C. § 1322(e) is unambiguous in its command that the underlying agreement and nonbankruptcy law are dispositive where, as here, a debtor seeks to cure mortgage arrears under a Chapter 13 plan.  The underlying agreement between the Debtor and Emigrant provides for a Default Rate of Interest and the Debtor does not dispute that the agreement is in accordance with applicable nonbankruptcy law.  The Default Interest Rate is therefore the proper interest rate to be used in calculating the Debtor's pre-petition mortgage arrears.  Accordingly, the Motion is denied.

## I.

In the spring of 2007, the Debtor purchased a six family residential building located at 1215 Frisco Ave., Far Rockaway, New York ("Property"). The Property was acquired for business purposes and is not the Debtor's residence.  The acquisition by the Debtor was financed by Emigrant.  On May 23, 2007, the Debtor obtained a loan in the principal amount of $315,000 from Emigrant evidenced by a promissory note ("Note") and secured by a commercial mortgage ("Mortgage") on the Property.  The Note and Mortgage provides for annual interest at 9% and rises, in the event of default, to an annual interest rate of 24%.  Monthly payments were to

2

commence on July 1, 2007. The Debtor made four monthly payments and with the payment due November 1, 2007 went into default. Emigrant declared the entire debt due and commenced a foreclosure proceeding on April 23, 2008. On April 25, 2008, the Debtor filed a Chapter 13 petition and thereby stayed the foreclosure proceeding.

The Claim was filed by Emigrant on May 19, 2008. Schedule B attached to the Claim lists pre-petition arrears amounting to $46,234.31. The pre-petition arrears consist of six unpaid monthly payments for the period of November 1, 2007 through April 25, 2008 aggregating $34,950.02 ("Pre-Petition Monthly Mortgage Arrearages"), plus other charges not disputed by the Debtor. The $34,950.02 figure for Pre-Petition Monthly Mortgage Arrearages is computed on the basis of the Default Interest Rate. The Debtor challenges this number, arguing that the Non-Default Interest Rate should be used and on that basis estimates that the Claim is excessive by approximately $21,000.

The Debtor filed an amended Chapter 13 plan, Doc. No. 25, proposing to cure the pre-petition arrearages to Emigrant over a 48 month period ("Plan"), and thereby de-accelerate and reinstate the original terms of the Note and Mortgage. However, the sum of $25,323.06 to be paid under the Plan, which assumes a Non-Default Interest Rate on the Pre-Petition Monthly Mortgage Arrears, falls short of the pre-petition arrearages sought in the Claim. Emigrant objects to the Plan because it fails to provide for the full amount of the Claim as required by 11 U.S.C. § 1325(a)(5)(B)(ii). Confirmation of the Plan has been held in abeyance pending judicial resolution of the proper interest rate to calculate the amount necessary to cure the Pre-Petition Monthly Mortgage Arrears.

## II.

Section 1322(e) of the Bankruptcy Code, 11 U.S.C. § 1322(e), was added to the bankruptcy statute by the Bankruptcy Reform Act of 1994.[1] This provision was made to apply to agreements entered into after October 22, 1994, the effective date of the 1994 amendments to the Code.[2] Section 1322(e) reads as follows:

> Notwithstanding subsection (b)(2) of this section and sections 506(b) and 1325(a)(5) of this title, if it is proposed in the plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Section 1322(b)(3) of the Bankruptcy Code, 11 U.S.C. § 1322(b)(3), provides that a Chapter 13 plan may provide for the curing of any default. However, prior to the enactment of section 1322(e), the Code had no provision addressing the amount required to cure a default under a Chapter 13 plan. Section 1322(b)(3) permitted a cure of a default pursuant to a Chapter 13 plan, but did not provide any definition of a cure or any statutory guidance as to the amount required to cure the default. Section 1322(e) filled the gap. For agreements signed after the effective date of section 1322(e), as in the instant case, if a Chapter 13 plan proposes to cure a default, the amount necessary to cure the default is determined in accordance with the underlying agreement and applicable nonbankruptcy law. Thus, in curing pre-petition payment defaults, a debtor will have to pay interest at a contractual default rate if it is enforceable under state or other nonbankruptcy law.

---

[1] Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 305, 108 Stat. 4106 (October 22, 1994).
[2] Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 702(b)(2)(D), 108 Stat. 4106 (October 22, 1994).

**III.**

It is undisputed that the Debtor defaulted on the loan from Emigrant. Further, the Debtor does not negate the existence of a Default Interest Rate in the underlying agreement with Emigrant. Nor does the Debtor contend that the Default Interest Rate provided for in the underlying agreement is unenforceable under applicable nonbankruptcy law, which in this case is New York State law. Instead, the Debtor asserts that while Emigrant's entitlement to the Default Interest Rate arises in the first instance from the agreement between the parties and applicable state law, any obligation of the Debtor to pay the Default Interest Rate is subject to a qualifying or contrary provision of the Bankruptcy Code, i.e., section 1322(b)(3). Under section 1322(b)(3), a Chapter 13 plan may "provide for the curing . . . of any default". According to the Debtor, a cure corrects all defaults and prohibits an award of default interest.

The position of the Debtor is based upon a 1988 decision of the Ninth Circuit, *Great Western Bank & Trust v. Entz-White Lumber and Supply, Inc. (In re Entz-White Lumber and Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988). In *Entz-White*, the Ninth Circuit held that, if a debtor cures a default as part of a plan of reorganization, the debtor "is entitled to avoid all consequences of the default including higher post-petition default rates." *Id.* at 1342. In support of this holding, the Ninth Circuit cited a leading case on cure, *In re Taddeo*, 685 F.2d 24 (2d Cir. 1982), for the proposition that, while undefined by the Code itself, "curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." *Id. a*t 1340. *Entz-White* interpreted *Taddeo* to mean that a post-default interest rate is a consequence of default which is nullified in the context of cure.

5

There are two discrete aspects to curing a default. First, the amount necessary to cure the default. Second, the legal consequences arising upon carrying out or implementing the cure. The issue before the Second Circuit in *Taddeo* and the only aspect addressed by that Court was the legal consequences upon cure effectuation. The Second Circuit ruled that curing a default allows Chapter 13 debtor/mortgagors, notwithstanding contractual acceleration clauses, to de-accelerate their mortgage and reinstate the original payment terms of the debt. Nowhere in *Taddeo* is there any mention as to how one is to determine the amount necessary to cure the default. *Taddeo* actually says nothing about restoration of pre-default interest rates. *Entz-White* extended the reasoning of *Taddeo* to determine the amount necessary to cure a default and decided the statutory right to cure nullifies or removes a contractual default rate from the computation. With the enactment of section 1322(e) in 1994, such extension of *Taddeo* is no longer justified or warranted. A prominent treatise on bankruptcy law accurately and succinctly summarized the effect of section 1322(e) as follows:

> Under section 1322(e), the amount necessary to cure a default is the same as would be required to cure if the debtor were not in bankruptcy. Two conditions must be met before interest and other charges can be required as part of a bankruptcy cure. First, the interest or charges must be required under the original agreement, and second, they cannot be prohibited by state law. In other words, the bankruptcy court will never require interest in excess of that permitted by state law, and will require none unless the agreement provides for interest.

*Collier on Bankruptcy,* § 1322.18 at 1322.67 (Alan N. Resnick et al., 15th ed. rev. 2006).

As indicated above, the underlying agreement between Emigrant and the Debtor provides for a Default Interest Rate and the Debtor does not contest its enforceability under New York

6

State law. Accordingly, the amount necessary to cure the Debtor's Pre-Petition Monthly Arrears for the period of November 1, 2007 through April 25, 2008 was properly computed by Emigrant on the basis of the Default Interest Rate.

## IV.

Section 1322(e) was enacted to overrule the Supreme Court decision in *Rake v. Wade*, 508 U.S. 464 (1993). In *Rake*, the Court required debtors curing pre-petition mortgage defaults to pay not only the interest on the principal, but also interest on that interest, as well as interest on other components of pre-petition arrearages. These interest payment requirements to cure were mandated by *Rake* even though applicable nonbankruptcy law prohibited them and were not contemplated by the parties to the original transaction. As stated by Representative Jack Brooks as part of the Floor Statements made in connection with the Bankruptcy Reform Act of 1994:

> [Section 1322(e)] will have the effect of overruling the decision of the Supreme Court in *Rake v. Wade*, 508 U.S. 464, 133 S.Ct. 2187, 124 L.Ed.2d 424 (1993). In that case, the Court held that the Bankruptcy Code required that interest be paid on mortgage arrearages paid by debtors curing defaults on their mortgages. Notwithstanding State law, this case has had the effect of providing a windfall to secured creditors at the expense of unsecured creditors by forcing debtors to pay the bulk of their income to satisfy the secured creditors' claims. This had the effect of giving secured creditors interest on interest payments, and interest on the late charges and other fees, even where applicable law prohibits such interest and even when it was something that was not contemplated by either party in the original transaction. This provision . . . will limit the secured creditor to the benefit of the initial bargain with no court contrived windfall. It is the Committee's

7

> intention that a cure pursuant to a plan should
> operate to put the debtor in the same position
> as if the default had never occurred.

H.R. Rep. 103-834, 103rd Cong., 2d Sess 55 (October 4, 1994).

Based upon the above legislative history, Debtor argues that § 1322(e) was designed to restrict rather than expand secured creditors' rights and therefore should not be construed to require payments of higher default interest rates to cure pre-petition defaults. This argument is flawed to the core. The essential thrust of the statement by Representative Brooks is that section 1322(e) is intended to leave the parties to the rights provided by their agreements and applicable nonbankruptcy law. Thus, the terms in the underlying agreement specifying an interest rate upon default should suffice, so long as it is not forbidden by applicable nonbankruptcy law. Moreover, where the language of the statute is so plain, as section 1322(e), there is no reason to search beyond its words for a different intent. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 634, 124 S.Ct. 1023, 10370 (2004); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947); *see also In re Thompson*, 372 B.R. 860, 865 (Bankr. S.D. Ohio 2007) (observing that the plain language of section 1322(e) has broader application than just the overruling of *Rake v. Wade*); *In re Landrum*, 267 B.R. 577, 582 (Bankr. S.D. Ohio 2001) (pointing out that while section 1322(e) was intended to overrule *Rake v. Wade*, "Congress did not go so far as to say that § 1322(e) was intended to accomplish this purpose alone); *In re Lake*, 245 B.R. 282, 285 (Bankr. N.D. Ohio 2000).

## V.

A contractual default rate of interest is a deliberate bargain among private parties. There is nothing intrinsically unscrupulous or wrong with a contractual default rate of interest. It

simply reflects a heightened risk of nonpayment and the unforeseeable cost involved in collected defaulted debt. As the Second Circuit long ago explained:

> A variable interest provision in the event of default such as we have here is not a penalty, nor should it be considered unconscionable. It can be beneficial to a debtor in that if may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the life of the loan. The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan.

*Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959), cert. denied, 361 U.S. 947 (1960) (Citations Omitted).

The general rule in bankruptcy is that contractual interest on a debtor's obligation accrues up to the date of the bankruptcy filing. If unpaid, all contractually accrued interest, including default interest, becomes an integral component of a creditor's claim in bankruptcy. The policy underlying section 1322(e) is that in determining the amount necessary to cure a default under a Chapter 13 plan, the equitable power of a federal court exercising bankruptcy jurisdiction may not be invoked to set aside rights vouchesafed to a secured creditor under contract and enforceable under applicable nonbankruptcy law. The accrued and unpaid interest that attached to the Debtor's contractual obligation to Emigrant from November 1, 2007 to April 25, 2008 was at the Default Interest Rate. Section 1322(e) provides that any defense to the Default Interest Rate that is available to the Debtor outside of the bankruptcy context is also available in bankruptcy. The Debtor has interposed no such defenses.

## VI.

Based on all of the foregoing, the Debtor's Motion seeking to reduce the Claim of Emigrant designated as Claim Number 2 in the above-captioned Chapter 13 case, is denied.

**IT IS SO ORDERED**

Dated: Brooklyn, New York
April 29, 2009

<u>s/Jerome Feller</u>
Jerome Feller
United States Bankruptcy Judge